IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 16-CV-0717-MSK

LISA M. MATTHEWS, and
MARK P. MATTHEWS,

 Plaintiffs,

*v*.

DOUGLAS COUNTY SCHOOL DISTRICT RE 1,

 Defendant.

---

**OPINION AND ORDER ON AFFIRMING THE ADMINISTRATIVE LAW JUDGE**

---

**THIS MATTER** comes before the Court on the Plaintiff's Complaint (**# 1**), the Plaintiff's Opening Brief (**# 51**), the Defendant's Response (**# 52**), and the Plaintiff's Reply (**# 53**). Upon consideration of the arguments presented in light of the Administrative Record (**#45**), the Administrative Law Judge's decision is affirmed.

## I.   JURISDICTION

The Court has jurisdiction over an appeal from a final decision of the Colorado Office of Administrative Courts under 20 U.S.C. § 1415(i)(2)(A). This case concerns compliance with the Individuals with Disabilities Education Act (IDEA).[1]

---

[1] For ease of reference, common acronyms are used by the parties and the Court. The IDEA is the Individuals with Disabilities in Education Act. A FAPE is a Free Appropriate Public Education. An IEP is an Independent Education Plan. ESY services are Extended School Year services.

## II. BACKGROUND[2]

The Plaintiffs are the parent and stepparent (the Parents) of J.U., who was a 16-year-old sophomore at Legend High School in Parker, Colorado, at the time of the Administrative Law Judge's (ALJ) decision. He has been diagnosed with Tourette Syndrome, dyslexia, and ADHD. His most recent Independent Education Plan (IEP) that is pertinent to this appeal identifies a primary disability as intellectual and a secondary disability as "Other Health Impairment".

### A. December 2013 IEP

Prior to 2013, J.U. resided, attended school and received special-education services in Arizona. He arrived in the Colorado for the 2013-2014 academic year, and was evaluated for disabilities by the Defendant Douglas County School District in September 2013.[3] The evaluation found that J.U. required special-education services to treat a specific learning disability, but not an intellectual disability. J.U.'s parents disagreed with the results of the evaluation, and consequently the District reevaluated him in November 2013. This evaluation concluded that J.U. also had an intellectual disability. Based on the evaluations, J.U.'s December 2013 IEP included nine specific, measurable goals in core academic subjects as well as social/emotional wellness and communication goals, academic achievement updates, informal assessments, occupational therapy updates, and parent input. Pertinent to the matter at hand, the IEP stated a goal of J.U. being able to read at a 2nd-grade level with 80% proficiency.

### B. March 2014 IEP

In March 2014, the IEP was reviewed with an eye to J.U.'s participation in summer break

---

[2] The Court recounts the facts as stated in the administrative decision, giving due weight to factual findings, and supplements them by references to the record. *See L.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004).

[3] R. Vol. 3 at 1046–1064.

extended-school-year (ESY) services. This IEP was substantively identical in all respects to the December 2013 IEP, but despite its purpose, it did not state what summer services would be provided, or when or how they would be provided. Ms. Matthews signed the IEP, confirming that she had received special procedural safeguards.

There is nothing in the record that indicates J.U.'s Parents requested summer services or they advised the District that no summer services would be needed. But it is clear that J.U. did not stay in Colorado during the 2014 summer break, and instead returned to Arizona to spend the break with his father. As a consequence, he received no ESY services from the District.

In September 2014, when J. U. returned to Colorado, his Parents had his reading skills and abilities evaluated by Corey Pollard, a learning specialist at Children's Hospital. Ms. Pollard administered a battery of tests that assessed J.U.'s verbal comprehension, concept formation, and visual matching skills in very low percentiles. Ms. Pollard issued an independent educational examination report (the Report), in which she recommended using reading "programs structured in the Orton-Gillingham approach, with a tutor qualified in working with intellectually disabled students".[4] Megan Malone, J.U.'s special-education teacher, received Ms. Pollard's Report in October 2014, after which she contacted Ms. Pollard about how to best help J.U.

In November 2014, Mr. Matthews insisted that the District incorporate the Report's findings and employ the Orton-Gillingham approach to J.U.'s reading program beginning in January 2015. Ms. Malone scheduled a meeting for December 17 to discuss a plan and asked Judy Jordan, the District's special-education coordinator, to find a reading curriculum that incorporated Orton-Gillingham. Ms. Jordan advised Ms. Malone that the Orton-Gillingham

---

[4] Orton-Gillingham is a structured, sequential approach to reading.

approach was used in the Wilson Reading Program and that the District had both the Wilson Reading Progam and a Wilson trainer.

J.U., his Parents, Ms. Jordan, and Ms. Malone were present at the December 17 meeting. Ms. Pollard participated by phone. Mr. Matthews presented what he alleged were the District's violations of the IDEA: (1) the District had been aware of J.U.'s limited progress in reading for over a year and had not considered any alternatives; (2) the District had predetermined that J.U. did not qualify for an alternative reading program; and (3) the District had been provided the Report but had not considered it. Mr. Matthews acknowledged that the District had no obligation to adopt the Report or implement a specific reading program, but he maintained that the District was obligated to implement *some* alternative program and had failed to do so. J.U.'s Parents asked him to read from a Colorado Driver's manual at the meeting but he was unable to do so. Ms. Jordan suggested the Wilson Reading Program that incorporated the Orton-Gillingham approach because the District had experience with it.[5] Ms. Pollard stated that the Wilson Program was appropriate for J.U., but emphasized that to be effective someone would have to be trained in using it. Ms. Malone stated that she would receive training in it. J.U.'s Parents and Ms. Jordan understood that Ms. Malone would begin using the Wilson program with J.U. once school resumed in January 2015.

Ms. Malone did not obtain training in the Wilson program during the Christmas break and thus did not begin using Wilson with J.U. when school resumed in January. Indeed, Ms. Malone did not inquire as to whether the District had a Wilson starter kit until January 22. In response, Ms. Jordan again gave Ms. Malone the contact information for the District's Wilson trainer, and by January 29, Ms. Malone had received Wilson training, was engaged in online

---

[5] The Barton Reading System was also discussed.

training as well, and had found two educational assistants who had Wilson training. She began using the Wilson program with J.U. on January 31.[6]

**C. March 2015 IEP**

A meeting to construct a new IEP was scheduled for March 9, but because the Parents had not received a draft IEP in sufficient time before the meeting, they filed a due-process complaint against the District. Among other things, they complained that they required such documentation at least 10 days beforehand. The IEP meeting began on March 9, but because the Parents were not present, it was discontinued. A proposed IEP was retained to allow for input from the Parents at a later date.

It appears that collaboration between the parties devolved thereafter. The District made entreaties to schedule another IEP meeting. The Parents would not meet without both the draft IEP, all correspondence among teaching staff concerning J.U., and his test results. Ultimately, the District scheduled an IEP meeting for May 21. It provided notice to the Parents on May 11 and a draft of the IEP on May 13. Two days before the meeting, Ms. Matthews informed the District that she and Mr. Matthews could not meet because (1) they had not received J.U.'s records and (2) the meeting was scheduled during her shift as a District bus driver. On May 19, Mr. Matthews asked to review J.U.'s file. The District responded that J.U.'s reading assessments and draft IEP comprised the substantive records, that any request to view J.U.'s file should be submitted using a specific form, and that their request to see correspondence among teaching staff would be processed through the District's legal office.

The IEP meeting was held on May 21 out of concern that it would be too difficult to meet once school was out for the summer. The Parents did not attend. Interestingly, however, a

---

[6] R. Vol. 2 at 1014.

progress report from March 31 showed that J.U. had progressed in reading using the Orton-Gillingham approach embodied in the Wilson Reading Program. The new draft IEP stated that the Report's recommendations "will be incorporated into the accommodations and services" for J.U. On May 26, the District informed Mr. Matthews that the meeting occurred, and advised that the Parents could request an IEP meeting at any time, but if another meeting with them present did not occur before June 4, the draft IEP would be finalized. The IEP was finalized on June 4 or 5.

**D.     Hearing Before the ALJ**

The ALJ held an evidentiary hearing on the Parents' due-process complaint, then issued findings of fact and conclusions of law. The ALJ found that all of J.U.'s IEPs were reasonably calculated to guarantee some educational benefit to J.U. Specifically, the ALJ found (1) that in 2013, District had not predetermined J.U.'s qualification for an alternative reading program; (2) that with regard to the 2013 IEP, the District was under no obligation to consider the Report by a date certain, implement any specific alternative reading program, or adopt specific reading programs insisted upon by the Parents; (3) that the Parents' had a misplaced belief that Orton-Gillingham was a particular reading program, as compared to an approach to reading instruction used in a variety of reading programs; (4) that the Wilson program incorporated the Orton-Gillingham approach, and by implementing it, the District considered and implemented the Report's recommendations; and (5) that the December 2014 meeting was not an IEP meeting. The ALJ noted that designation of particular teaching methodologies or curricula such as the Wilson program are not typically included in IEPs, and that nothing in the IDEA requires school districts to choose specific programs or methodologies. The ALJ acknowledged the Parents' frustration with the District's delay in implementing the Wilson program in early January 2015,

but found that the Parents failed to present any credible evidence that the one-month delay of J.U.'s instruction using Wilson deprived him of a free appropriate public education (FAPE).

Addressing the Parents' allegations of procedural IDEA violations, the ALJ found that (1) the District failed to timely provide the Parents with J.U.'s records, but that such failure did not amount to the District failing to include the Parents in the IEP meetings; (2) implementing the Wilson program did not trigger the IDEA's notice requirements, and even if it did, J.U.'s Parents presented no evidence that any lack of notice impaired his right to a FAPE; and (3) the record is unclear whether the Parents were denied procedural safeguards, but even so, J.U.'s Parents failed to establish that any such failure impeded J.U.'s right to a FAPE.

### III.    ISSUES PRESENTED

The Parents seek review of the ALJ's decision.    They identify six issues — two substantive and four procedural violations of the IDEA.

1. Was the 2014 IEP reasonably calculated to enable J.U. to make progress appropriate in light of his circumstances?

2. Did the District fail to provide ESY services in 2014 and 2015?

3. Did the District fail to implement the 2015 IEP?[7]

4. Did the District fail to respond to the due-process complaint?

5. Did the District fail to produce J.U.'s education records?

6. Did the District fail to convene an IEP meeting after receiving the Report?

Although the alleged violations of IDEA are argued *in seriatim*, the fundamental issue with regard to both the substantive and procedural issues is whether the District failed to provide

---

[7]   Though the Parents characterize this issue as a substantive violation of the IDEA, the failure to implement an IEP does not strike at whether the IEP was reasonably calculated to enable progress, which is the substance of the IEP.    Rather, it challenges the procedural implementation of the IEP, the content of which is not challenged.    As a result, the Court considers this issue to raise a procedural violation of the IDEA.

7

J.U. a FAPE during summer 2014 and the 2014–2015 academic year.

## IV. STANDARD OF REVIEW

The Court's standard of review in IDEA cases is less deferential than it is to other administrative decisions. *See Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1149 (10th Cir. 2008). The Court applies a "modified *de novo*" standard, independently reviewing the administrative record and rendering a decision by a preponderance of the evidence. *See id.*; *Murray v. Montrose Cty. Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th Cir. 1995). The Court must, however, give "due weight" to the administrative decision's findings of fact, "which are considered *prima facie* correct." *L.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004).

## V. DISCUSSION

### A. The IDEA Generally

States receiving federal funds for education must, among other things, provide a free appropriate public education (FAPE) to all eligible children. 20 U.S.C. § 1412(a)(1). A FAPE includes special-education instruction and related services to assist in the child's benefit from instruction. 20 U.S.C. § 1401(9), (26), & (29). Such instruction and services are memorialized in the child's individualized education program (IEP), which is to be developed in a collaborative process involving both parents and educators. 20 U.S.C. §§ 1401(9)(D), 1414. "The IEP is a written statement that sets forth the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals." *Ass'n for Cmty Living v. Romer*, 992 F.2d 1040, 1043 (10th Cir. 1993). The IEP is the means through which special education and related services are "tailored to the unique needs" and circumstances of a particular child — "the centerpiece of the statute's education delivery system for disabled

children." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1 (Endrew II)*, 137 S. Ct. 988, 999 (2017).

A FAPE has both substantive and procedural components. The Court determines whether the district complied with the IDEA's procedural requirements and whether the IEP developed by those procedures is substantively adequate. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07 (1982). If a district meets both substantive and procedural requirements, it "has complied with the obligations imposed by Congress and the courts can require no more." *Id*. at 207.

**B.     Substantive Requirements**

Until recently in this Circuit, a FAPE required only a IEP was that was calculated to confer an "educational benefit [that is] merely more than *de minimis*." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1 (Endrew I)*, 798 F.3d 1329, 1338 (10th Cir. 2015), *overruled by Endrew II*, 137 S. Ct. 988. In *Endrew II*, however, the Supreme Court reversed the Tenth Circuit's formulation as inconsistent with its decision in *Rowley*.[8] It stated that to "meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew II*, 137 S. Ct. at 999.

For children integrated into regular classrooms, this means that an IEP must be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id*. at 1000. For children not "fully integrated in the regular classroom and not able to

---

[8]     The Parents argue that the Supreme Court's reversal requires automatic remand here because the ALJ applied the *Endrew I* standard. The Court disagrees. The Court's review is essentially *de novo*, deferring only to the ALJ's factual findings. The Parents, granted leave to fully brief the issue, identified no reason why the Court cannot apply the new *Endrew II* standard with the ALJ's factual findings. Owing no deference to the ALJ's findings of law, the Court will decide the appeal.

9

achieve on grade level", the IEP "must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Id*. To be "reasonably calculated" to accomplish a particular objective requires "a prospective judgment by school officials [and] contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." *Id*. at 999. Review of an IEP considers the question of whether the IEP is reasonable, not whether the court regards it as ideal. *Id*.

Although this new standard is more demanding than the Tenth Circuit's previous standard, it does not require that an IEP "provide a child with a disability opportunities to achieve academic success, attain self-sufficiency, and contribute to society that are substantially equal to the opportunities afforded to children without disabilities." *Id*. at 1001. Indeed, the Court refused to define what appropriate progress looks like because the "adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Id*.

> 1. *Whether J.U.'s March 2014 IEP was reasonably calculated to enable J.U. to make progress appropriate in light of his circumstances.*

The ALJ found that the March 2014 IEP was reasonably calculated to guarantee some educational benefit to J.U. She also concluded that after Ms. Pollard issued her report, the District was under no obligation to consider it within a specified time, implement any specific alternative reading program, or adopt specific reading programs insisted upon by the Parents. The Court finds no error in these determinations.

The Parents argue that the ALJ's factual findings should not be accepted because they misstate Ms. Pollard's hearing testimony. In particular, they contend that the ALJ misstated the facts with regard to whether J.U. was dyslexic. They state that Ms. Pollard did not testify that

10

J.U. was not dyslexic.[9] The Court has reviewed Ms. Pollard's testimony and agrees with J.U.'s Parents that the ALJ arguably misstated Ms. Pollard's testimony as to dyslexia, but such misstatement is immaterial.[10]

The Parents also argue that the District failed to provide J.U. a FAPE during the 2014–2015 academic year because the March 2014 IEP did not incorporate the findings and recommendations of the Report. This argument appears to be predicated on two misunderstandings — that the March 2014 IEP failed to anticipate J.U.'s reading needs, and that the District used the Wilson Reading Program rather than the Orton-Gillingham approach.

Addressing the Parents' first concern, it is undisputed that the Report post-dated the creation of the March 2014 IEP by six months, and therefore the March 2014 IEP could not have included the Report's findings and recommendations. When the March 2014 IEP was formulated, neither the Parents nor the District anticipated that the Orton-Gillingham approach was necessary or would benefit J.U.[11] Indeed, J.U.'s Parents signed the March 2014 IEP without it. When J.U.'s reading did not progress, they justifiably became concerned and asked Ms. Pollard for her assistance. There is no evidence that the District should have anticipated

---

[9] The Parents also challenge the ALJ's finding that Ms. Pollard said that the District could provide adequate services. Because the question is not whether the District could provide appropriate services, but instead whether it did so, this statement is ultimately irrelevant.

[10] Contrary to the ALJ's findings, Ms. Pollard did not testify that J.U. was not dyslexic. Instead, she identified a divergence in the medical community about whether dyslexia is an appropriate diagnosis for someone with J.U.'s issues, and she explained why she did not endorse a diagnosis of dyslexia. Whether Ms. Pollard diagnosed J.U. as suffering from dyslexia, however, is of little or no importance because she and the Parents agree that his reading difficulties, however characterized, were best addressed by using the Orton-Gillingham approach. *See* R. Vol. 4 at 1249–50, 1252.

[11] The Parents point to an "admission" by the District after Spring Semester 2014 that J.U. had not progressed in his reading. This does not establish that the March 2014 IEP was inadequate. The IDEA does not mandate progress; it mandates that the IEP be reasonably calculated to progress the child according to his circumstances. *See Endrew II*, 137 S. Ct. at 999.

Ms. Pollard's findings and conclusions. The Court agrees with the ALJ's finding that the March 2014 IEP was reasonably calculated to enable J.U.'s success under the circumstances known at the time. Once notified of the recommendations of the Report, the District considered it as required by 34 C.F.R. § 300.502(c)(1), and implemented the Orton-Gillingham approach through the Wilson Reading Program. The Parents point to no authority that required the District to convene an IEP meeting to address the Report or to adopt its recommendations any earlier than it did.

Another misunderstanding underlies the Parents' second concern. They contend that the District's reliance on the Wilson program was unjustified because it was "outside the four corners of the IEP". At first blush, this argument appears to be inconsistent with J.U.'s Parents' first argument. Initially, they argued that the District should have incorporated the Report findings, but here they argue that the District should not have used the Wilson program (which included the recommended Orton-Gillingham approach) because in was not specified in the IEP. Construing these arguments in a cohesive rather than contradictory fashion results in the same observation as made by the ALJ — that the Parents did not understand that the Wilson Reading Program used the Orton-Gillingham approach recommended by the Report. As the ALJ noted, teaching programs and curricula are generally not enumerated in IEPs and that nothing in the IDEA requires school districts to choose specific programs or methodologies.[12] It appears the

---

[12] The Parents insist that the ALJ was wrong — that teaching programs and curricula are commonly included in the IEP and should have been here, citing various guidance documents from the Colorado Department of Education. Guidance from the state defining special education does not operate to alter the IDEA, which sets forth what an IEP must contain: (1) a statement of the child's present levels of academic achievement and functional performance, (2) a statement of measurable annual goals, (3) a description of how the child's progress toward meeting the goals will be measured and when progress reports will be provided, (4) a statement of the special education and supplementary services to be provided and a statement of program modifications or supports for school personnel that will be provided; (5) an explanation of the

District acted as it was required to do; it considered the recommendations of the Report and used its resources to provide reading instruction using the Orton-Gillingham approach.

The Court finds that the March 2014 IEP was not deficient because it did not initially include Orton-Gillingham instruction, and that the District moved to appropriately incorporate the Orton-Gillingham approach in the Wilson Reading Program. Ultimately, J.U. received instruction with the Orton-Gillingham approach beginning in January 2015.

### 2. *Whether the District failed to provide ESY Services in 2014 and 2015.*

The Parents argue that the March 2014 IEP made J.U. eligible for ESY services during the summer of 2014, but that the District never developed a plan for such services and never provided them. The Parents say that, as a result, they were forced to obtain such services at private expense for both Summers 2014 and 2015. The District responds that J.U. spent his summers with his natural father in Arizona, and that although there may be an obligation for the District to provide ESY services wherever a child's private circumstances take him, the Parents never approached the District about providing ESY services in Arizona. Rather, without notice to the District, Mrs. Matthews arranged for private tutoring in Arizona.

It is undisputed that the District did not provide ESY services for J.U. during summers 2014 and 2015. It also appears undisputed that J.U.'s Parents never approached the District about providing ESY services in Arizona. The ALJ did not discuss ESY services.

---

extent to which the child will not participate with nondisabled children in regular classrooms; and (6) a statement of any individual accommodations that are necessary to measure academic achievement and functional performance; and (7) if the child is 16, appropriate measurable postsecondary goals and transition services. 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(VIII). Congress contemplated no addition of information to the IEP — "Nothing in this section shall be construed to require that additional information be included in a child's IEP beyond what is explicitly required in this section." 20 U.S.C. § 1414(d)(1)(A)(ii). Furthermore, Department of Education rulemaking indicates that nothing in the IDEA "requires an IEP to include specific instructional methodologies." Analysis of Changes and Comments, 71 Fed. Reg. 46539, 46665 (Aug. 14, 2006).

The parties are essentially talking past each other — the District never offered; the Parents never inquired. Neither points to any authority that indicates whose job it is to get the ball rolling for ESY services. Without a clear answer, the Court begins with Department of Education regulations, which state that each school district "must ensure that [ESY] services are *available* as necessary to provide a FAPE", and that they "must be provided only if a child's IEP Team determines" that such services "are necessary for the provision of FAPE to the child." 34 C.F.R. § 300.106(a)(1)–(2) (emphasis added). Thus, it appears that the District had an obligation to make ESY services *available* to J.U., but it was not required to affirmatively provide such services unless the IEP Team determined that they were necessary. The record shows that the IEP Team changed J.U.'s qualification for ESY services from "to be determined" to "qualifies". Assuming that "qualifies" is the same as "necessary", the District was required to provide services.

Had J.U. remained in Colorado, the Court would have little difficulty in finding that the District had some duty to offer services at its facilities. But as a practical matter, there is no way that the District could provide services to J.U. in Arizona unless his parents requested them or, at a minimum, apprised the District of the specifics of J.U.'s summer circumstances. The parents have advanced no authority — and the Court cannot find any — placing the onus on the District to reach out to the Parents to determine when, where, and how it can provide ESY services. Such a conclusion reads too much into the statutory phrase "make available". *See* 34 C.F.R. § 300.106(a)(1). Rather, it is clear from the sum of the IDEA's provisions that Congress intended parents and school personnel to collaborate on how to serve the child's needs. Under these circumstances, it was incumbent upon the Parents take *some* step to advise the District where J.U. would be in Arizona and for what time period so that the District could

arrange for services to be provided. In failing to advise the District, J.U.'s parents prevented the District from providing services and thus are not entitled to reimbursement for services privately obtained.

## C. Procedural Requirements

The Supreme Court has explained that IDEA's procedural safeguards are important. *Rowley*, 458 U.S. at 205. "But merely identifying a procedural deficiency does not automatically entitle a family to relief." *Endrew I*, 798 F.3d at 1335. Rather, to be actionable, a procedural failure must have impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the FAPE decisionmaking process, or caused a deprivation of educational benefits. *Id*. (quoting 20 U.S.C. § 1415(f)(3)(E)).

The Parents identify four procedural violations of the IDEA: (1) failure to implement the March 2015 IEP, (2) failure to respond to their due process complaint, (3) failure to produce J.U.'s educational records until just before the due-process hearing, (4) failure to convene an IEP meeting after receipt of the Report. The Court has addressed the failure to convene an IEP meeting after receiving the Report, and therefore addresses only the first three challenges. As frustrating as procedural violations may be, the ultimate question is whether any denied J.U. a FAPE.

### 1. *Whether the District failed to implement March 2015 IEP.*

The Parents are correct that a District can violate the IDEA by failing to implement an IEP. *See O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 702 (10th Cir. 1998). The Parents argue that the District never implemented "services and supports", but identifies only the Orton-Gillingham approach. This approach was implemented in January 2015 via use of the Wilson Reading Program, long before the March 2015 IEP was discussed or

finalized. Thus, there is no evidence of a failure to implement the March 2015 IEP.

### 2. *Whether the District failed to provide a response to the Parents' due-process complaint.*

Department of Education regulations state that a school district must respond to a parent's due-process complaint within 10 days of receipt. 34 C.F.R. § 300.508(e). The response must include an explanation of the district's action, a description of the options considered, a description of the records and reports used in making its decision, and a description of other relevant factors. 34 C.F.R. 300.508(e)(1)(i)–(iv). The District's response denied their factual allegations with some explanation, but did not address the explanation for its decision or include any description of other relevant factors. *See* R. Vol. 1 at 125–26.

J.U.'s Parents argue that the District's summary response prevented them from fully preparing for the administrative hearing and meaningfully participating in it.[13] To grant relief, the Court must find that the District's summary response adversely impacted their "opportunity to participate in the FAPE decisionmaking process, or caused a deprivation of educational benefits." *Endrew I*, 798 F.3d at 1335.

Unfortunately, J.U.'s Parents contentions are conclusory and do not explain *how* they were prejudiced. As to the administrative hearing, it is not clear that the Parents were prejudiced — they had days to present evidence and cross-examine the District's witnesses. As to the March 2015 IEP, the District repeatedly sought their participation in the FAPE process, which the Parents refused. It is true that the Parents wanted J.U.'s records and did not have them in March. But seeing as how parents can call an IEP meeting at any time, the Parents

---

[13] The ALJ did not expressly address this issue in her decision, but issued an order that discussed the District's failure to respond to the due-process complaint. *See* R. Vol. 1 at 155–58. In it, the ALJ found that neither party was complying with the Court's orders or actively participating in the administrative proceeding. As a result, the ALJ ordered the parties to appear jointly at a conference.

could have participated in the March 2015 meeting as scheduled and moved to amend the IEP once they had J.U.'s records. Perhaps, most importantly, during the contentious dispute between the Parents and the District, J.U. was receiving instruction with Orton-Gillingham approach just as the Parents requested. At the end of the day, J.U.'s reading improved and his FAPE was unimpeded.

### 3. *Whether the District failed to produce J.U.'s education records.*

Department of Education regulations provide that a school district must permit parents to inspect and review any education records relating to their child and his or her FAPE without unnecessary delay. 34 C.F.R. § 300.613(a). The regulations do not define unnecessary delay, but in no case may a district take longer than 45 days. *Id*.

The ALJ found that the District unreasonably delayed production of J.U.'s records:

> The District failed to provide the records timely, and required Parents to fill out a formal "request for records" form prior to receiving a portion of J.U.'s records. The IDEA does not contemplate requiring parents to sign forms in order to receive their children's records. Although the District did eventually make a concerted effort to locate all of J.U.'s records, and eventually did provide them to Parents, the time it took the District to do so was not reasonable. However, Parents had a strong, but incorrect, belief, that many more records existed for J.U. than actually did. Because of that belief and the dispute over records that took place over the summer and fall of 2015, it is difficult for the ALJ to determine when exactly the District ultimately provided the entirety of J.U.'s records to Parents. Regardless, the records were not timely provided.

R. Vol. 1 at 416. But, in applying *Endrew I*, the ALJ also concluded that the Parents failed to show that the District's delay prevented J.U. from receiving a FAPE because the March 2015 IEP was substantively reasonable, the Parents were not kept from participating in his decisions, and nothing about the records dispute deprived J.U. of any educational benefit.

The Parents argue that, despite numerous requests, the District did not disclose all of J.U.'s records until just before the administrative hearing, and as a result they were unable to

meaningfully participate in the proceeding due to the delay. The Court disagrees. The Parents were invited to participate in the March 2015 IEP meeting, or to schedule another. They have shown no prejudice in their participation in the administrative hearing and J.U. was not denied a FAPE.

## VI. CONCLUSION

For the foregoing reasons, the ALJ's decision is **AFFIRMED**, in all respects. The Court expresses no opinion on the effect of this order on the proceedings in Case No. 17-CV-3163. Judgment shall issue in favor of the District and the Clerk shall close this case.

Dated this 4th day of October, 2018.

BY THE COURT:

*Marcia S. Krieger*

Marcia S. Krieger
Chief United States District Judge